UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                       Case No. 22-cr-0176-bhl-1

NYGIL A. MCDANIEL,

          Defendant.

## ORDER GRANTING DEFENDANT'S MOTION
## TO DISMISS COUNT SIX

        In March of 2022, Nygil A. McDaniel's then-girlfriend (and now his co-defendant) purchased a gun for him from a federal firearms licensee in Kenosha, Wisconsin and then promptly delivered the gun to McDaniel. (ECF No. 38 at 5.) At the time, McDaniel was subject to pending state court charges for felony child neglect based on his having left his minor children at home sleeping and unsupervised while he and his girlfriend went to the grocery store. (*Id.* at 4.) A federal grand jury later indicted McDaniel on four federal firearms charges, including a charge based on his March 2022 receipt of a gun from his girlfriend. (ECF No. 1.) McDaniel responded to the Indictment with four motions to dismiss, (ECF Nos. 31–34), three of which the Court has already denied. (ECF Nos. 69, 70, 82). This Order addresses McDaniel's fourth motion, which challenges Count Six of the Indictment, in which he is charged with violating 18 U.S.C. § 922(n) by receiving a firearm while subject to pending felony charges. (ECF No. 34.)

        On May 3, 2023, Magistrate Judge Stephen C. Dries issued a Report recommending the Court grant McDaniel's motion. (ECF No. 53.) Judge Dries concluded that the Constitution "presumptively protects McDaniel's conduct" and the government had failed to meet its burden of demonstrating that Section 922(n) was consistent with the United States' historical traditional of firearm regulation. (*Id.* at 1.) On June 1, 2023, the government filed objections to the Report. (ECF No. 61.) For the reasons stated below, the Court rejects the government's objections and adopts Judge Dries's conclusion that 18 U.S.C. § 922(n) is unconstitutional as applied to McDaniel. McDaniel's motion to dismiss Count Six is therefore granted.

## STANDARD OF REVIEW

A district court reviews *de novo* "those portions of [a magistrate judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3). This "review requires the district [court] judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). The district court "makes the ultimate decision to adopt, reject, or modify" the magistrate judge's recommendation. *Schur v. L.A. Weight Loss Ctrs.*, 577 F.3d 752, 760 (7th Cir. 2009). Unchallenged portions of the report are reviewed only for clear error. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (citing *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir. 1995)).

## ANALYSIS

Count Six of the Indictment charges McDaniel with violating 18 U.S.C. § 922(n), a provision that makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." McDaniel is alleged to have received a Smith & Wesson SD9VE 9mm pistol from his then-girlfriend while subject to pending state court felony child neglect charges. (ECF No. 38 at 4–5.) As noted above, the state court charges stemmed from an August 2020 incident in which police were called to his residence and found that McDaniel and his girlfriend had left his two young children sleeping at home alone while the adults went grocery shopping. (*Id*. at 4.)

Magistrate Judge Dries agreed with McDaniel that the Section 922(n) charge, stemming from McDaniel's possession of a firearm at a time he was merely charged and not yet convicted of felony child neglect, violates the Second Amendment. (ECF No. 53 at 21–22.) The government contends that McDaniel's Second Amendment challenge fails for two reasons. First, the government contends the right to bear arms is limited to law-abiding, responsible citizens and McDaniel, as a felony indictee, falls outside the scope of the amendment's protections. (ECF No. 61 at 4–7.) Second, the government contends that Section 922(n)'s bar on indictees possessing arms aligns with historical firearms regulations. (*Id.* at 7–18.) The Court agrees with the magistrate judge that Count Six of the Indictment, as applied to McDaniel, violates the Second

Amendment. Accordingly, the Report and Recommendation will be adopted and Count Six dismissed.

I. **The Second Amendment Limits the Government's Ability to Regulate an Individual's Right to Bear Arms.**

The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. Over the last two decades, the Supreme Court has decided a series of cases addressing and clarifying the scope of the Second Amendment's protections: *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022), and, most recently, *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024). Through these precedents, the Supreme Court has confirmed that the right to keep and bear arms is not a vacuous platitude—it places real limits on government efforts to restrict an individual's possession of a firearm. The Supreme Court has at the same time, however, emphasized that the right to keep and bear arms is not without limitation. Not all government regulations on firearm possession necessarily offend the Constitution.

In *Heller*, the Supreme Court confirmed that the "core" of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" and struck down a District of Columbia law that, among other things, banned handgun possession in the privacy of an individual's home. 554 U.S. at 630, 635. Two years later, in *McDonald*, the Supreme Court confirmed that the right to keep and bear arms for self-defense is among the individual federal rights protected from state interference under the Due Process Clause of the Fourteenth Amendment. 561 U.S. at 791. Then, in 2022, the Supreme Court decided *Bruen* and laid the framework for analyzing Second Amendment challenges to firearm regulations. The Court explained that the Second Amendment fundamentally "protect[s] the right of an ordinary, law-abiding citizen . . . to carry a handgun for self-defense outside the home." 597 U.S. at 8–10. Applying this principle, the Court ruled New York's "proper cause" requirement for obtaining a concealed carry license unconstitutional because it prevented law-abiding citizens who have ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms. *Id.* at 70–71. Harkening to the Second Amendment's original public meaning, the Court explained that the fundamental question is whether a challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. This question is answered by "reasoning by analogy" to determine whether a challenged law is "relevantly similar" to historically accepted regulations. *Id.* at 28–29 (citing Cass R. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev.

741, 773 (1993)). The Supreme Court further explained that the central considerations are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29.

This past summer, the Supreme Court offered a specific application of the *Bruen* methodology in *Rahimi* and rejected a facial challenge to 18 U.S.C. § 922(g)(8), a federal statute barring an individual who is subject to a domestic violence restraining order from possessing a firearm. 144 S. Ct. at 1902. *Rahimi* reversed a Fifth Circuit decision that the Court concluded had incorrectly read *Bruen's* reasoning by analogy approach "to require a 'historical twin' rather than a 'historical analogue.'" *Id.* at 1903. The Supreme Court emphasized that *Bruen's* "relevantly similar" directive does not require the government to identify identical preexisting regulations. *Id.* at 1897–98 (the Second Amendment does not "trap[] in amber" only those restrictions on firearms ownership that were in place at the founding). Rather, courts should focus on "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898. This requires an analysis of both "why" and "how" a regulation burdens the right to bear arms. *Id*. As to the first question, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* As to the second question, a modern regulation addressing the same problem need not "precisely match its historical precursors," so long as it "comport[s] with the principles underlying the Second Amendment." *Id.* Even then, however, a restriction will offend the Second Amendment if it addresses the problem "to an extent beyond what was done at the founding." *Id.*

Using this approach, the *Rahimi* Court had little trouble confirming that Section 922(g)(8) was constitutional because it was "relevantly similar" to "surety" and "going armed" laws from the founding, both of which were used to target, subject to specific procedural protections, "individuals found to threaten the physical safety of another." *Id.* at 1900–01. The Court held that Section 922(g)(8) imposed a burden that "fits within our regulatory tradition," highlighting the statute's limited application–barring firearm possession only *after* a restraining order was entered based on specific finding that the defendant represents a credible threat to the physical safety of another. *Id.* at 1901–02. It also noted that the regulation was, like a surety bond, of limited duration and only applied while the defendant was subject to the restraining order. *Id.* at 1902.

Finally, the Court noted that the penalty was appropriately limited, concluding that "going armed" laws provided for imprisonment to respond to the use of guns to threaten others while Section 922(g)(8) embraced the lesser restriction of temporary disarmament. *Id.* at 1902. Thus, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id.* at 1896.

The Seventh Circuit has not yet addressed a Second Amendment challenge to Section 922(n). Nor has it yet had occasion to apply *Rahimi*. But, over the last two years, the Court of Appeals has offered guidance on resolving Second Amendment challenges to federal firearms charges. While the parties were briefing McDaniel's objections in this case, the Seventh Circuit remanded without deciding an appeal concerning a Second Amendment challenge to a federal felon-in-possession charge under 18 U.S.C. § 922(g)(1). *See Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023).[1] In doing so, the Court of Appeals offered commentary on the considerations that should guide the district court in performing a "proper, fulsome analysis of the historical tradition" supporting challenged laws. *Id*. at 1022–24.

Several months later, in *United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023), the Seventh Circuit upheld a district court's denial of a Second Amendment challenge to the prosecution of a defendant for making a false statement to a federal firearms dealer in violation of 18 U.S.C. § 922(a)(6). While Section 922(n) was not directly implicated, the Seventh Circuit discussed its likely constitutionality. *Id.* at 1017–18. It rejected the defendant's contention that he could not be prosecuted for misrepresenting that he was not "under indictment or information" for a felony at the time of the purchase, explaining that the government can, consistent with the Second Amendment, punish a false statement even if the subject of the statement might be constitutionally protected. *Id*. It then went further, citing *Bruen* and emphasizing that the government can also "keep firearms out of the hands of dangerous people who are apt to misuse them," and noting that "the very act of lying to obtain a firearm implies a risk that the weapon will be misused." *Id*. The Seventh Circuit also expressly acknowledged that Section 922(n)'s constitutionality "remains unresolved," but opened the door to "as applied" challenges, noting that defendants subject to non-

---

[1] The Court of Appeals declined to rule on the Second Amendment issue and instead remanded the case to the district court with instructions to engage in a more fulsome analysis of the issue. *Atkinson*, 70 F.4th at 1022. Given the Seventh Circuit's commentary in *Atkinson*, this Court ordered the parties to submit supplemental briefing addressing the Seventh Circuit's statements. (ECF No. 71.) That briefing is now concluded.

violent felonies (criminal anti-trust charges) might succeed with Second Amendment objections while defendants indicted for more dangerous offenses (domestic violence) would have trouble showing that their indictments "flunk[ed] the constitutional standard." *Id.*[2]

More recently, in *United States v. Gay*, 98 F.4th 843 (7th Cir. 2024), the Seventh Circuit rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms. *Id.* at 846–47. After first denying the defendant's contention that the evidence was insufficient to support the verdict convicting him, the Court of Appeals concluded there was also no Second Amendment problem with his conviction. *Id.* Citing *Heller*, *McDonald*, and *Bruen*, the Seventh Circuit explained that the defendant's contention that convicted felons had a Second Amendment right to possess firearms was "hard to square" with the Supreme Court's repeated emphasis that longstanding prohibitions on the possession of firearms by felons remained valid. *Id.* at 846. Echoing its statements in *Holden*, the Court of Appeals emphasized the Supreme Court's teaching that the persons who possess rights under the Second Amendment are "'law-abiding, responsible citizens' or a variant." *Id*. The Court then again acknowledged there was "some room" for as-applied challenges to the statute. *Id*. But the Court confirmed that the defendant, having been convicted of 22 felonies, including aggravated battery of a peace officer and possession of a weapon while in prison, fell well outside that group. *Id.* at 846–47.

## II. The Government Has Not Shown that Section 922(n) Is Relevantly Similar to the Nation's Historical Firearm Regulations as Applied to McDaniel.

Section 922(n) makes it "unlawful for any person who is under indictment [but not yet convicted] for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm . . . which has been shipped or transported in interstate or foreign commerce." As applied to McDaniel, the government has charged him with violating this prohibition by receiving a Smith & Wesson SD9VE 9mm pistol from his then-girlfriend. At the time he received the firearm, McDaniel was subject to a February 16, 2022 information in which he was charged with two counts of felony child neglect. (ECF No. 38 at 4.) Both charges stemmed from an incident in August 2020 when police were called to his residence and found that he and his girlfriend had left McDaniel's two young children sleeping at home alone while the adults went to get groceries.

---

[2] On June 7, 2024, the Seventh Circuit decided *United States v. Scheidt*, 103 F.4th 1281 (7th Cir. 2024), and affirmed its reasoning in *Holden*, concluding that "the Second Amendment does not immunize purchasers from knowingly providing misstatements in ATF Form 4473." *Id.* at 1284–85.

(*Id*.)  Based on the allegations in the Indictment, McDaniel appears to have violated Section 922(n), according to its terms.  The prosecution can go forward if the charge against McDaniel can be squared with the Second Amendment.

Under *Bruen* and *Rahimi*, the dispositive issue is whether the government has shown that Section 922(n) "is consistent with the principles that underpin our regulatory tradition" and "relevantly similar" to laws that our nation's "tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898; *see also Bruen*, 597 U.S. at 28–29.  In resolving this issue, the Court must focus on "why" and "how" Section 922(n) burdens McDaniel's right to bear arms.  *Rahimi*, 144 S. Ct. at 1898.  In *Rahimi*, the Supreme Court considered *how* well-established surety and going armed laws operated and *why* such laws were enacted to discern a tradition of temporarily disarming an individual found by a court to pose "a clear threat of physical violence to another." *Id.* at 1899–1901.  The Court concluded that Section 922(g)(8) "matches the surety and going armed laws" and "fits neatly within the tradition" those laws represent.  *Id.* at 1901–03.  In reaching this conclusion, the Court emphasized that Section 922(g)(8) only temporarily disarms those who, after notice and an opportunity to be heard, have been actually "found by a court" to "represent[] a credible threat to the physical safety" of another.  *Id.* at 1901.  It concluded that Section 922(g)(8), like surety and going armed laws, "restricts gun use to mitigate demonstrated threats of physical violence." *Id.*  Section 922(g)(8) and both surety and going armed laws were also comparable in the way they burdened the right to bear arms because they were temporary restrictions and required "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902.  Thus, the Supreme Court found that Section 922(g)(8) is "'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right." *Id.* at 1901.

The parties' briefing here came before, and thus without the benefit of, *Rahimi*'s discussion of these issues.  Nevertheless, the government has identified four arguments supporting Section 922(n)'s constitutionality.  It first maintains that the Second Amendment's protections do not extend to individuals, like McDaniel, who are subject to active felony charges. (ECF No. 61 at 4–7.)  The government also offers three analogies that it contends show Section 922(n) is consistent with the nation's historical tradition of firearm regulation, including relevantly similar restrictions on the possession of firearms by individuals deemed dangerous or untrustworthy, prohibitions on

possession by defendants in pretrial detention, and surety laws restricting the right to possess a gun by people accused of posing a threat. (*Id.* at 7–18.)

Given *Rahimi*, *Holden*, and *Gay*, there is little doubt that the government has sufficiently answered the first "why" question in the Second Amendment analysis. Section 922(n) is facially consistent with long established, and constitutionally permitted, efforts to keep firearms out of the hands of dangerous individuals. *See Rahimi*, 144 S. Ct. at 1901 (confirming tradition of restrictions targeting "individuals found to threaten the physical safety of another"); *Holden*, 70 F.4th at 1017 (emphasizing that the government can also "keep firearms out of the hands of dangerous people who are apt to misuse them"); *Gay*, 98 F.4th at 846–47 (finding that the defendant with 22 felony convictions did not fit the description of a "'law-abiding, responsible citizen' or a variant"). But *Rahimi* makes clear this is just part of the analysis; "how" Section 922(n) addresses this problem is also critical. 144 S. Ct. at 1898. Thus, the government must also establish that Section 922(n) is sufficiently similar to its historical predecessors, even if not a precise match for them. 144 S. Ct. at 1898. This requires the Court to analyze whether Section 922(n) comports with underlying constitutional principles and whether it goes beyond the means used to address the problem at the founding. *Id.*

### A. McDaniel's Status as a Non-Violent Felony Indictee Does Not Exclude Him from the Second Amendment's Protections.

The government's first effort to justify its indictment of McDaniel under Section 922(n) is based on the broad contention that the Second Amendment does not protect him at all. The government insists that the Second Amendment only applies to law-abiding, responsible citizens, and McDaniel, as a felony indictee, falls outside the scope of the Amendment's protections. (ECF No. 61 at 7.) Citing statements in *Bruen* describing the Second Amendment's protection of the rights of "ordinary, law-abiding" citizens, the government contends that because McDaniel was a felony indictee at the time he received the gun from his girlfriend, he falls outside the Second Amendment's protection. (*Id.*)

As Judge Dries recognized, this argument paints with too broad a brush. As a textual matter, the Second Amendment confers the right "to keep and bear arms" on "the people." U.S. Const. amend. II. And, as the Supreme Court has explained, in this context when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" and there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580–81. As Judge Dries

commented, "the Supreme Court . . . has never implied that those merely accused of a felony are removed from 'the people' entitled to Second Amendment protections." (ECF No. 53 at 7.)

In *Rahimi*, the Supreme Court rejected the government's argument that the Second Amendment allows Congress to disarm anyone the legislature declares is not "responsible." 144 S. Ct. at 1903. The Supreme Court explained that "'[r]esponsible' is a vague term" and although *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those opinions "said nothing about the status of citizens who were not 'responsible.'" *Id.* That "question was simply not presented" in Supreme Court precedent. *Id.* The term "law-abiding" is similarly vague. *See Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc) ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague.") (*vacated in light of Rahimi*, No. 23-374, 2024 WL 3259661, 602 U.S. --- (2024)). The government's mere labelling of an individual as "irresponsible" or "non-law abiding" is insufficient to strip that person of his or her Second Amendment rights.

Moreover, if accepted, the government's position would erase the second of the two *Rahimi* questions. As noted above, our nation has a long tradition of regulating firearm possession to keep weapons out of the hand of *dangerous*, non-law abiding criminals. Indeed, in both *Holden* and *Gay*, the Seventh Circuit cited the same Supreme Court passages invoked by the government, emphasizing that the Second Amendment protects the rights of "law-abiding, responsible citizens." *See Holden*, 70 F.4th at 1017; *Gay* 98 F.4th at 846. But, again, this is only part of the analysis, and it does not justify overly broad restrictions on gun possession that are untethered to the principles underlying the Second Amendment. The Seventh Circuit explicitly acknowledged this point in recognizing the potential for as-applied Second Amendment challenges by non-violent offenders. *See Holden*, 70 F.4th at 1018; *Gay* 98 F.4th at 846. In *Holden*, the Court of Appeals specifically emphasized that "some applications of § 922(n) would flunk the constitutional standard." 70 F.4th at 1018. The Court then identified individuals who are subject to indictments for non-violent felonies, like antitrust offenses, as examples for this constitutional constraint. *Id.* These decisions confirm that the Seventh Circuit has not accepted the government's overly broad position and that, while a defendant's status as not being law abiding may be part of the basis for regulating a person's right to possess a gun, it is only a part.

The government tries to bolster its position by insisting that the state court made a finding that McDaniel was not law abiding. It points to the state court's determination that probable cause

existed to believe McDaniel had committed a felony and contends this is a sufficient justification to bar him from receiving a firearm until the charges were proved. (ECF No. 61 at 7.) This too overstates McDaniel's status and too easily deprives him of his Second Amendment rights. McDaniel is entitled to a presumption of innocence not only in this case but in the underlying state case too. A finding of probable cause that he committed a crime is not a finding that he actually did so. When McDaniel was charged with violating Section 922(n), he was not a *convicted* felon or subject to any other firearm restriction. As far as this Court is aware, McDaniel still has not been convicted and retains the presumption of innocence in both this case and on the underlying state charges on which Count Six of the Indictment is based. The government's argument, that a mere probable cause finding on child neglect charges takes McDaniel outside the scope of the Second Amendment, does not withstand scrutiny. An "indictment itself is not any evidence whatever of guilt," but "merely a means of . . . getting a case into court and of informing the defendant of the nature of the charges against him." *United States v. Faulkner*, 488 F.2d 328, 331 (5th Cir. 1974). "The principle that there is presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1985).

Moreover, nothing in the state court charges pending against McDaniel suggests he was or is a danger to the public simply as a result of those charges. He is alleged to have snuck out to the grocery store with his girlfriend while his two children were sleeping. While reasonable persons might disagree on whether this was responsible parenting, there is no allegation that his conduct created a risk of violent danger to the community or a credible threat to the physical safety of others. Indeed, the charges against him are for child *neglect*, not intentional child *battery* or *abuse*. Unless and until there is some finding that McDaniel is not sufficiently "law-abiding" or otherwise determined to be a danger to the community, he retained his rights to keep and bear arms.

### B. The Government Has Not Shown that the Application of Section 922(n) to McDaniel Is Consistent with Historic Firearm Regulations.

The government next offers three analogies to support the constitutionality of Section 922(n) as applied to McDaniel. It contends that the statute is "relevantly similar" to (1) liberty restrictions on pretrial detainees, (2) laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law; and (3) surety laws restricting the guns rights of people accused of posing a threat. (ECF No at 61 at 7–18.) The *Rahimi* Court clarified that a modern law restricting the right to bear arms must be "consistent with the principles that underpin our

regulatory tradition." 144 S. Ct. at 1898. Applying that methodology, courts must ascertain whether the challenged law is "relevantly similar" to historical laws, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* (alteration in original) (quoting *Bruen*, 597 U.S. at 29). In that case, the Supreme Court rejected the government's contention that the surety and going armed laws demonstrated a tradition of restricting Second Amendment rights only to "responsible" people. *Id.* at 1903. As the *Rahimi* court explained, the surety and going armed laws together represent a tradition of temporarily disarming those "found by a court to pose a credible threat to the physical safety of another." *Id.* at 1903. Section 922(g)(8) temporarily disarms those who, after notice and an opportunity to be heard, have been "found by a court" to "represent[] a credible threat to the physical safety" of another. *Id.* at 1901–02. Thus, that statute "matche[d] the surety and going armed laws" and "fit[] neatly within the tradition those law represent. *Id.* at 1901–03; see also *Bruen*, 597 U.S. at 38, 53 (founding-era laws limited "the intent for which one could carry arms" (to terrorize), "the manner of carry," such as concealed, and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied) but did not represent a tradition of banning "public carry altogether"). With this backdrop, the government's contentions are each addressed below.

### 1. Pretrial Detention Is Not a Historical Analogue for Section 922(n).

The government contends that Section 922(n) is analogous to historical laws allowing pretrial detention of indicted defendants. (ECF No. 61 at 8–11.) The government asserts that at our nation's founding, individuals charged with serious crimes were frequently detained without bail. (*Id.* at 8.) The Judiciary Act of 1789, enacted two years before the Second Amendment was ratified, "granted criminal defendants an absolute right to bail in non-capital cases but made bail discretionary 'where the punishment may be death.'" *Id.* (quoting Judiciary Act of 1789, ch. 20 § 33, 1 Stat. 91). The government reasons that because "the government had the greater power to detain indicted defendants until they could be tried on serious charges[,] [i]t follows that the government must also have the lesser power to release felony defendants on the condition that they do not obtain firearms." (*Id.* at 17.) The government argues that pretrial detention, which allows a court to impose substantial restrictions on an indicted individual's liberty is "relevantly similar" to Section 922(n), which prohibits felony indictees from receiving a firearm. (*Id.* at 16.)

McDaniel acknowledges that our nation has a historical tradition of placing pretrial conditions on indictees, including firearms restrictions, but insists that does not establish a

historical tradition of "blanket disarmament of *all* felony indictees." (ECF No. 63 at 4 (emphasis in original).) McDaniel argues that pretrial detention is not a valid historical analogue because a detention hearing has "substantial procedural safeguards," while Section 922(n) has none. (ECF No. 43 at 20 (quoting *United States v. Quiroz*, 629 F. Supp. 3d 511, 525 (W.D. Tex. 2022).) Judge Dries concluded that that government's reliance on historical laws allowing pretrial detention "undercuts, rather than supports, the constitutionality of Section 922(n)." (ECF No. 53 at 14.) The Court agrees. In the pretrial detention process, before being detained pending trial, an individual must be determined to pose a threat to society by a judge, and only after an adversarial proceeding where "the accused has an opportunity to appear and argue for their release." *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1193 (W.D. Okla. 2022). At a pretrial detention hearing, the accused appears with counsel and may testify, present witnesses, and cross-examine government witnesses. *See* 18 U.S.C. § 3142(f); *see also* § 3142(c)(1)(B)(viii) (allowing a federal court to order a person on federal pretrial release to "refrain from possessing a firearm, destructive device, or other dangerous weapon" if needed to "reasonably assure the appearance of the person as required and the safety of any other person and the community"). As noted by Judge Dries, Section 922(n) has no such similar procedural safeguards or limits. (ECF No. 53 at 16.) There is no requirement that the accused be given notice and an opportunity to respond to the allegations before the indictment is issued. The Court agrees that pretrial detention is not "analogous enough to pass constitutional muster." *See Bruen*, 597 U.S. at 30.

   **2. Disarming Individuals Deemed Dangerous or Untrustworthy Does Not Provide Historical Support for Section 922(n) as Applied to McDaniel.**

The government next asserts that Section 922(n) is analogous to laws from the founding that disarmed dangerous or untrustworthy people. According to the government, because there is a national history of disarming certain groups deemed dangerous, the "legislature[] c[an] impose broad status-based bans on firearm possession or acquisition." (ECF No. 61 at 14.)

In response, McDaniel notes that no founding-era legislation imposed the status-based ban contained in Section 922(n). (ECF No. 63 at 9.) And felony indictees are not necessarily categorically "dangerous." (*Id.* at 10.) The Court agrees that the government has not shown a historical tradition burdening the receipt of a firearm based on the mere existence of charges for just any felony offense. Of course, *Rahimi* does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901 (citation omitted). But

*Rahimi* requires that any category used by the legislature and the imposed burden be "consistent with the principles that underpin our regulatory tradition" to be constitutional. *Id.* at 1898; *see also Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."). Section 922(n)'s categorical ban prohibiting "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year" from receiving a firearm is not justified by any relevant historical tradition.

In *Holden*, the Seventh Circuit noted that "[g]overnments may keep firearms out of the hands of dangerous people who are apt to misuse them." 70 F.4th at 1017. But it cabined that point with the observation that some applications of Section 922(n) would likely "flunk the constitutional standard." *Id.* 1018. There is nothing in the record to support the government's contention that McDaniel, who is presumed innocent, was a dangerous or untrustworthy person merely because he was subject to pending felony child neglect charges at the time he received the firearm at issue. McDaniel had not been convicted or even accused of engaging in violent or threatening behavior and the record before the Court does not demonstrate a history of dangerous criminal conduct. An indictment for conduct showing violent behavior or dangerousness to the community might be sufficient to bar him from receiving a firearm, if consistent with historical tradition. An indictment for felony child neglect, however, does not by itself mean McDaniel is "the sort of person who cannot be trusted with guns." *Id.* at 1018 (giving as an example someone under indictment for domestic violence); *see also Rahimi*, 144 S. Ct. at 1902 (concluding that banning an individual from possessing a firearm who is determined by a court to pose a credible threat to the physical safety of a domestic partner is consistent with Second Amendment). The government has failed to prove a historical tradition of prohibiting a presumptively innocent indictee accused of felony child neglect of receiving a firearm.

### 3. Surety Laws Are Not Historically Analogous to Section 922(n) as Applied to McDaniel.

The government's final argument is that Section 922(n) is analogous to historical surety laws that required a person feared to be threat to another to post a bond, known as a surety. If he refused, he was prohibited from carrying a firearm in public absent special need. *See Bruen*, 597 U.S. at 55–59 (discussing historical surety laws). Surety laws originated in England and were "intended merely for prevention, without any crime actually committed by the party, but arising only from probable suspicion." 4 William Blackstone, Commentaries on the Law of England 249

(1769). These surety laws "derived from a longstanding English tradition of authorizing government agents to seize arms from persons who had acted unlawfully or in a manner that threatened the public." *United States v. Rowson*, 652 F. Supp. 3d 436, 467 (S.D.N.Y, 2023) (collecting English laws). Surety laws "imprisoned or otherwise restricted only those persons who had disturbed the peace or whose public possession of a firearm, as determined by a justice of the peace or other legal process, was otherwise likely to spread fear among the public." *Id.* at 469.

In *Bruen*, the Supreme Court rejected surety laws as an analogue to New York's proper cause purchasing regime because, unlike the surety laws, the New York restriction "presumes that individuals have *no* public carry right without a showing of heightened need, [while] the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'" 597 U.S. at 56 (emphases in original) (citing Mass. Rev. Stat., ch. 134, § 16 (1836). "In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55. Massachusetts passed the first such law in 1836. *Id.* at 55–56. The Massachusetts law "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.* at 56 (citing Mass. Rev. Stat. ch. 134 § 16 (1836)). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law. *Id.* at 56. These 19th century laws are not from the founding era of this nation and, as Justice Thomas noted, the historical record reflects "little support" that surety laws were a severe constraint on anyone thinking of publicly carrying a weapon and such laws were "intended merely for prevention" and "not meant as any degree of punishment." *Bruen*, 597 U.S. at 57 (quoting 4 Blackstone, Commentaries at 249). The cases from Massachusetts and the District of Columbia highlighted by the Supreme Court also all involved "black defendants who may have been targeted for selective or pretextual enforcement." *Id.* at 58. The Supreme Court further noted that surety laws' "barren record of enforcement" was an "additional reason to discount their relevance." *Id.* at 58 n.25.

In *Rahimi*, the Supreme Court considered how surety and "going armed" laws operated at our nation's founding as well as their purpose to discern a tradition of temporarily disarming those found by a court to present "a clear threat of physical violence to another." 144 S. Ct. at 1901. The "individualized surety regime" allowed justices of the peace to "'arrest' all who 'go armed

offensively [and] require[d]'" them to post bond for keeping the peace. *Id.* at 1899–1901 (quoting 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794–1795, ch. 26, pp. 66–67 (1896)). The Supreme Court emphasized that surety laws offered significant procedural protections before burdening conduct: a person "'having reasonable cause to fear' that the accused would do him harm or breach the peace" had to make a complaint to the judicial authority, who would take evidence and allow the accused an opportunity to respond. *Id.* at 1900 (citing Mass. Rev. Stat., ch. 134, §§ 1, 3–4, 16). Bonds were of limited duration and exceptions existed including for self-defense. *Id.* "Going armed" laws similarly prohibited "'riding or going armed, with dangerous or unusual weapons, [to] terrify[]'" and were punishable by "forfeiture of the arms . . . and imprisonment." *Id.* at 1901 (quoting 4 Blackstone, Commentaries at 149). "Taken together, the surety and going armed laws confirm [that] . . . [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.*

Although Judge Dries acknowledged the many ways historical surety laws are relevantly similar to Section 922(n), such as protecting society from the risk of armed violence by a subset of individuals who pose a threat and imposing a temporary restriction on the right during a potentially volatile period, the magistrate judge determined the analogy failed because surety laws require a specific individualized finding that a person would cause an injury or breach of the peace with a firearm while Section 922(n) requires no such individualized finding. (ECF No. 53 at 20–21 (citing *Stambaugh*, 641 F. Supp. 3d at 1192).) The Court agrees with Judge Dries. Section 922(n) makes it a crime for any indicted person to receive a firearm without any "specific showing of 'reasonable cause to fear an injury, or breach of the peace.'" *See Bruen*, 597 U.S. at 56 (quoting Mass Rev. Stat., ch. 134, § 16 (1836)).

*Rahimi* is also instructive on this point. The Supreme Court held that an individual's disarmament does not violate the Second Amendment so long as a court determines that the individual poses a credible threat to the physical safety of another. 144 S. Ct. at 1901. That is not the case here. The felony charges that McDaniel faced when he received the gun at issue were for child neglect, a nonviolent crime. At that time, no court had determined that McDaniel would cause an injury or breach of the peace with a firearm.

Section 922(n) also differs in the burden placed on an individual's Second Amendment rights. Surety laws did not bar an individual from publicly carrying a firearm so long as the offender posted surety. As McDaniel notes, Section 922(n), in contrast, casts an "absolute"

restriction that cannot be overcome. (ECF No. 43 at 28). Section 922(n) also lacks any procedural protections or limits. Its prohibition on receiving a firearm begins with the return of *any* felony indictment. There is no requirement that the accused be given notice and an opportunity to respond to the allegations to explain why he is not a danger. And the restriction lasts as long as the indictment remains pending; a felony indictee cannot overcome Section 922(n)'s restriction by posting a surety bond. In McDaniel's case, he was restricted from receiving a firearm after an information was filed accusing him of felony child neglect—an adversarial proceeding did not occur. McDaniel was neither entitled to notice nor an opportunity to be heard so he never had a chance to contest his "Second Amendment-rights-depriving status as an indictee." *Stambaugh*, 641 F. Supp. 3d at 1192. The alleged societal problem of persons under indictment receiving firearms surely has existed since our Nation's founding, but there is no similar analogue for McDaniel's situation. This is telling.

The government has failed to meet its burden to show Section 922(n) is consistent with historical traditions of firearms restrictions depriving people like McDaniel, accused of a non-violent felony, from receiving a firearm. Accordingly, Section 922(n) is unconstitutional as applied to McDaniel and his motion to dismiss Count Six of the Indictment will be granted.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Court **OVERRULES** the government's objections, ECF No. 61, to Judge Dries's Report and Recommendation, ECF No. 53, and **ADOPTS** the Recommendation of Judge Dries.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Count Six, ECF No. 34, is **GRANTED**.

Dated at Milwaukee, Wisconsin on August 28, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge